IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                                                NO. CR 02-1411 JP

WILLIAM D. WEBER,

        Defendant.

## MEMORANDUM OPINION AND ORDER

On September 25, 2002, Defendant William D. Weber filed a Motion to Suppress Evidence and Statements Illegally Obtained. (Doc. No. 20). The Court held a hearing on the motion on December 4, 2002. Roger Finzel represented the Defendant, who was present. Elaine Ramirez appeared on behalf of the United States. After a full day of testimony, the hearing was continued and ultimately rescheduled for April 1, 2003.

On March 7, 2003, an arrest warrant was issued for Defendant. At the April 1, 2003 hearing, Roger Finzel represented the Defendant, who failed to appear. Elaine Ramirez represented the United States. Because of the Defendant's absence, Mr. Finzel declined to present additional evidence on Defendant's motion to suppress. Although Mr. Finzel stated that the Defendant has not presented all of the evidence Defendant wishes to present in support of his motion, the Court finds that there is sufficient evidence in the record for the Court to rule on Defendant's motion at this time. Having considered the parties' briefs, the evidence in the

record, and the relevant case law, this Court will deny Defendant's Motion to Suppress Evidence and Statements Illegally Obtained.

I.      **Background**

On May 4, 2002, National Park Service Firefighter Andres Garcia was leading the Big Thicket Fire Crew.[1] The fire crew was conducting a pre-fire survey on private lands and public lands administered by the Bureau of Land Management ("BLM"). The purpose of the pre-fire survey was to locate and identify fire hazards, structures, access routes, and safety escape routes. The fire crew had a structure survey report, which had been prepared ten years earlier, and the fire crew's task on May 4, 2002, was to check on the structures in the report and update the report. One of the structures identified in the report was located on Defendant's property.

Defendant owns a parcel of land surrounded by private land, BLM land, and National Park Service land. Defendant's property (exceeding 19 acres) is approximately seven miles from New Mexico Highway 53, reachable by Jeep Trail 100, a rough dirt road that leads from the El Calderon parking area along Highway 53. An Airstream trailer is situated on Defendant's property approximately 250 feet from the road. No fence or hedge surrounds the Airstream trailer. The Airstream trailer contains such items as a bed, desk, VCR, television, heater, dishes, various utensils, a pantry-type area with food, pots, pans, bookshelves, books, magazines, a refrigerator, a stove, mail, bills, and other documents belonging to Defendant Weber.

A large greenhouse is located 600 feet from the Airstream trailer ("Greenhouse 1&2"). Greenhouse 1&2 is not visible from the Airstream trailer. The frame of the greenhouse is

---

[1] The fire crew, while federal government employees, are not delegated as law enforcement officers.

constructed of wood, which is covered with sheets of translucent and transparent plastic. Greenhouse 1&2 is divided into two rooms. Above one of the rooms is a loft, which contains a pillow, mattress, and blankets. Scattered around the outside of Greenhouse 1&2 are tools, lumber, five-gallon cans, a car battery, a broken-down vehicle, and water buckets. Located to the south of Greenhouse 1&2 are four posts and an open gate; to the north, a fireplace with a hood; to the west, various construction materials (wood, plastic, tires, barrels, etc.) and refuse; and to the east, remnants of a barbed wire fence.

Also present near Greenhouse 1&2 is an outhouse-like structure. A smaller greenhouse ("Greenhouse 3"), a slide-in camper trailer, and a travel trailer are located on Defendant's property, as well.

On May 4, 2002, the fire crew drove down Jeep Trail 100, towards Defendant's property, and examined three structures on other private property along the way. Mr. Garcia and the fire crew then drove up a two-track road leading to Defendant's Airstream trailer. Mr. Garcia observed a "No Trespassing" sign on the road to the trailer. Despite seeing the "No Trespassing" sign and knowing the land was private, Mr. Garcia drove halfway up Defendant's driveway. Mr. Garcia honked the horn on his vehicle to get the property owner's attention in order to inform the property owner that the fire crew was conducting a structure inventory. When no one responded to Mr. Garcia's honking of the horn, Mr. Garcia turned around and drove back down the driveway. Mr. Garcia parked his vehicle in an area marked by a "No Trespassing" sign. The fire crew then proceeded on foot, traveling from the northwest to the southeast, to locate and identify structures on Defendant's property.

The fire crew came upon the outhouse-like structure and Greenhouse 1&2. When Mr. Garcia first saw Greenhouse 1&2, he thought it was a house. Mr. Garcia approached the greenhouse, from the northwest direction, to within 40 feet. From that distance, Mr. Garcia was able to see through an open door into the greenhouse. Mr. Garcia observed what appeared to him to be two rows of marijuana plants. The marijuana plants were in black containers sitting on two long tables. After identifying the plants as marijuana plants, Mr. Garcia realized the structure was a greenhouse and noted the location of the greenhouse via a Global Positioning System ("GPS") device. The fire crew then immediately left the area. The fire crew did not have a search warrant.

Mr. Garcia later reported his observations to National Park Service Ranger Jean Ratliff, who contacted Agent Stephen Fleming of the BLM, who in turn, called Special Agent John R. Brenna, Jr., of the BLM. Agent Brenna interviewed Ms. Ratliff and Mr. Garcia to gather their information. Agent Brenna then went to the county assessor's office to determine the owner of the property, who turned out to be Defendant Weber. Agent Brenna also ran a National Crime Information Center ("NCIC") check of Defendant and discovered that an outstanding felony arrest warrant had been issued for Defendant by the Cibola County Sheriff's Office.

On May 8, 2002, Agents Fleming and Brenna drove on the two-track road towards Defendant's property, using the GPS information provided by Mr. Garcia. Agents Fleming and Brenna located the Airstream trailer and then turned around and left the area. The agents observed a hand-painted "No Trespassing" sign.

On May 16, 2002, Agent Brenna obtained a search warrant for Defendant's property, and on May 20, 2002, law enforcement officers executed the search warrant. The law enforcement officers parked at a fork in the road leading to Defendant's property. Agent Fleming and four

other agents walked from a northerly direction towards the location of Greenhouse 1&2, using a hand-held GPS device.  When the law enforcement officers arrived at Greenhouse 1&2, they found Defendant inside the greenhouse, pruning marijuana plants.  An associate of Defendant's, Mr. Preznel, was also discovered inside the greenhouse, handling the marijuana plants.[2]  The law enforcement officers identified 106 marijuana plants in Greenhouse 1&2.

While Agent Fleming searched the greenhouse, Agent Brenna and a couple of other law enforcement officers searched the Airstream trailer.  The agents found five marijuana plants inside the Airstream trailer.  After searching the Airstream trailer, Agent Brenna and the other law enforcement officers searched the other structures on Defendant's property.  Greenhouse 3 contained 27 more marijuana plants; the travel trailer contained three pounds of packaged marijuana; and the slide-in camper trailer, which was used as a drying room, contained remnants of marijuana stalks.  In total, the law enforcement officers found 138 marijuana plants on Defendant's property.

II.     **Discussion**

In support of his motion to suppress, Defendant argues that the physical and testimonial evidence obtained by the government as a result of the fire crew's search of Defendant's property on May 4, 2002, is inadmissible as the fruits of an illegal search.  Defendant contends that Greenhouse 1&2 was Defendant's home and that the hodgepodge of construction materials, fireplace, posts, and remnants of a barbed fire fence mark the curtilage of Defendant's home. Defendant claims the curtilage covers an area of approximately 60 to 100 feet by 100 feet.

---

[2]There is evidence that a third individual was present on Defendant's property that day, but the individual fled, and law enforcement officers were not able to apprehend him.  To date, this third individual has not been found.

Defendant asserts that, when the fire crew approached the greenhouse and observed the marijuana plants, the fire crew invaded Defendant's curtilage, violating Defendant's Fourth Amendment rights.  In response, the United States contends that the open fields doctrine, combined with the plain view doctrine, permitted the fire crew to look inside the greenhouse from 40 feet away.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. A warrantless search is unconstitutional if the defendant has a legitimate expectation of privacy in the area to be searched.  United States v. Anderson, 154 F.3d 1225, 1229 (10th Cir. 1998).  To establish a legitimate expectation of privacy, the defendant must show (1) a subjective expectation of privacy in the area searched, and (2) that society is prepared to recognize that expectation as reasonable.  Id.

A defendant has a legitimate expectation of privacy in both the home and the curtilage of the home.  Oliver v. United States, 466 U.S 170, 180 (1984).  The curtilage is defined as "the area which extends the intimate activity associated with the 'sanctity of a man's home and privacies of life.'"  Id. (quoting Boyd v. United States, 116 U.S. 616, 630 (1886)).  The protections afforded by the Fourth Amendment, however, do not extend to the open fields. Oliver, 466 U.S. at 179; Hester v. United States, 265 U.S. 57, 59 (1924).  To determine whether an area is part of the curtilage or the open fields, a court looks at four factors:  (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by passers-by.  United States v. Dunn, 480 U.S. 294, 301 (1987).

In this case, even assuming that Greenhouse 1&2, and not the Airstream trailer, was Defendant's home, Defendant cannot demonstrate that the BLM fire crew invaded Defendant's curtilage when the crew approached the greenhouse. Although the fire crew came within relatively close proximity to Greenhouse 1&2 (40 feet), the other three Dunn factors indicate that Defendant did not have a reasonable expectation of privacy in the area surrounding Greenhouse 1&2.

First, the claimed curtilage lacks an enclosure. Defendant argues that the curtilage on the north side is marked by a fireplace; on the south side, by four posts and a gate-like structure; on the east side, by a fence post and the remnants of a barbed wire fence; and on the west side by various "construction materials." The "construction materials" include plastic, tires, barrels, various pieces of wood, and other refuse. The portion of fence on the east side appears to be no more than the remnants of a former fence now in serious disrepair. The lone fireplace with a hood on the north side does not form a perimeter of 60 to 100 feet in length, just as the isolated four posts on the south side do not mark a boundary of the same length. Moreover, the random "construction materials" scattered throughout the area cannot be construed in any manner to enclose the greenhouse.

"[F]or most homes, the boundaries of the curtilage will be clearly marked . . . ." Dunn, 480 U.S. at 294 (quoting Oliver, 466 U.S. at 182 n.12). In this case, they are not. See United States v. Hogan, 122 F.Supp.2d 358, 362 (E.D.N.Y. 2000) (holding that dilapidated stockade fence on property did not enclose front of house where it merely extended from side of house and ran through area behind house). There is little to advise passers-by who approach to within 40 feet of Greenhouse 1&2 that they have just passed an important threshold. This fact makes this

case distinguishable from United States v. Reilly, where man-made barriers (including trees deliberately planted along the perimeter, hedgerows, and a partially fallen fence), combined with natural markers, made it immediately apparent to observers that the area was private.  76 F.3d 1271, 1276-78 (2d Cir. 1996).

Second, the nature of the uses to which the greenhouse and its immediate surrounding area were put does not indicate that they were being used for the intimate activities of the home. The cultivation of crops, such as marijuana, is an activity that occurs in the open fields; it is not an intimate activity of the home.  United States v. Van Damme, 48 F.3d 461, 464 (9th Cir. 1995). Moreover, the "construction materials" and other refuse scattered randomly around the greenhouse do not suggest that the area was being used for domestic activities.  Although there is evidence that someone was using the loft in the greenhouse as a sleeping area, there is nothing to indicate to an objective observer on the outside that the greenhouse and its surrounding area was being used as a home or for the privacies of life.

Finally, the remaining Dunn factor -- the steps taken to protect the area from observation by passers-by – does not support the inference that the fire crew invaded the curtilage of Defendant's home.  Here, there is no intact fence that surrounds Greenhouse 1&2 or the Defendant's property to prevent a person from wandering onto the property and seeing what lays within.  The sporadic "No Trespassing" signs and remnants of a barbed wire fence are not enough protection from passers-by to satisfy the last Dunn factor.  See United States v. Lewis, 240 F.3d 866, 871 (10th Cir. 2001) (finding no reasonable expectation of privacy in property even though defendant surrounded his property with an eight-foot fence, locked gates, and numerous "No Trespassing" signs); Hogan, 122 F.Supp.2d at 361-62 (holding that officers were entitled to enter

driveway and perimeter of house to conduct dog sniff because house was not enclosed, obscured from view, or used for any purpose other than entrance or egress).  Furthermore, there was no structure that obscured Greenhouse 1&2 from view.  In fact, the greenhouse was constructed with translucent and transparent plastic siding that actually enabled a person to see inside the greenhouse from a considerable distance away.

Given the lack of an enclosure, the presence of construction materials and other refuse strewn around the area, the translucent and transparent walls of the greenhouse, and the lack of evidence of intimate activities of home life, this Court finds that Defendant did not have a reasonable expectation of privacy, protected by the Fourth Amendment, in the area located 40 feet from Greenhouse 1&2.

III.    **Conclusion**

In sum, the fire crew acted lawfully in traveling through Defendant's property to complete their pre-fire structure survey.  The fire crew did not invade Defendant's curtilage by approaching within 40 feet of Greenhouse 1&2.  The fire crew was standing in the open fields when Mr. Garcia observed the marijuana plants through an open door of the greenhouse.  The fire crew responded appropriately to their discovery by not seizing the marijuana plants at that time, and instead, reporting their observations to the appropriate authorities.  Hence, this Court concludes that the fire crew's actions in this case were lawful and reasonable.

IT IS THEREFORE ORDERED that

1.      Defendant's Motion to Suppress Evidence and Statements Illegally Obtained (Doc. No. 20) is DENIED.

2.	Should Defendant reappear and wish to present additional evidence in support of his motion, Defendant may file a written request to renew Defendant's motion to suppress.

_____
CHIEF UNITED STATES DISTRICT JUDGE